UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-1835
Summary Calendar
_____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                    versus

MARLON KEITH BARTON,

                                        Defendant-Appellant.

_____

Appeal from the United States District Court for the
             Northern District of Texas
_____
                  (May 13, 1993)
                (                    )


Before GARWOOD, JONES and EMILIO M. GARZA, Circuit Judges.

GARWOOD, Circuit Judge:

     Defendant-appellant, Marlon Keith Barton (Barton), appeals his conviction for threatening by mail to kill the President of the United States on the sole ground that the district court erred in denying his motion for judgment of acquittal based on the assertion that he was insane when he committed the offense.  Because the evidence was not such as to compel a finding that Barton was insane at the time of the offense, we affirm.

## Facts and Proceedings Below

     Barton's story begins on April 10, 1991, approximately three

months before he wrote the threatening letter, at the Dallas Central Appraisal District where he worked.[1]  On that morning, Barton acted strangely at work.  Barton arrived at work an hour or so earlier than he normally did, but refused to speak to any of his coworkers.  One coworker asked him to come to her office, which he did.  She asked him questions, but he remained mute and simply stared at her.  Later he returned to his desk and sat at his computer, neither working nor speaking to anyone.  Soon, the personnel manager brought Barton to the hospital and attempted to have him admitted.  Initially Barton manifested his consent by filling out the admitting forms, but he then tore up the forms. The hospital refused to admit him and Barton went home.

The next day, Barton surrendered to the Dallas County Jail for a probation violation of failing to regularly contact his probation officer.  Barton remained in jail from April 11, 1991, to August 2, 1991.

About a week following the events of April 10, one of Barton's coworkers called the jail and spoke to Barton.  Barton spoke to the worker and apologized for his actions and the problems he had caused.

A few days after his April 10 incarceration, Barton's Aunt Darleen came to visit him.  During the visit Barton was spaced out and unresponsive.  About two weeks later, Barton wrote Darleen concerning the visit saying that he had erred in violating the terms of his probation and that he wanted to start life over again

---

[1]    Prior to this time, Barton had been a good worker for fifteen months.

when released.

While in jail, Barton wrote the following letter to President Bush: "Hello, Mr. Bush, I'm angered and filled with hatred that you sent my brothers over to fight a war we knew nothing about or had any reason being over there. For that I promise to kill you when I get out. I hate your ass to death."[2] Barton signed the letter, and his return address appears on the envelope.[3]

On July 15, 1991, a White House mail analyst received the letter and turned it over to the Secret Service. Not long after, Barton was arrested on the instant charge of threatening to kill the President.

After his arrest, the district court ordered a mental health evaluation of Barton to determine his competency to stand trial. Initially, the Metropolitan Correctional Center at Miami found that Barton was suffering from a severe mental illness, was incompetent to stand trial, and was in need of psychiatric care. He was then sent to the Federal Medical Center in Rochester for an evaluation of his competency and criminal responsibility and treatment. Barton arrived there on January 7, 1992. Staff psychologist Dr. Thomas Kucharsky said that Barton arrived at the center mute, bordering on catatonia, and with a passive bland affect. With the court's permission, Kucharsky treated and involuntarily medicated Barton. Although ill, Barton still ate, drank, and took care of

---

[2] Barton has no real brothers, but he may have been using the word in a more generic sense.

[3] There is no doubt that Barton wrote the letter. It was in his handwriting, contained his fingerprints, and his counsel basically admitted it during closing arguments at trial.

his personal hygiene.

Kucharsky diagnosed Barton as suffering from Brief Reactive Psychosis, a mental illness with symptoms "essentially the same as symptoms of schizophrenia. The major distinction being that the duration of the illness is less than six months."

Kucharsky opined that within a reasonable medical certainty Barton was suffering from this disease and therefore it was "highly likely" that he was unable to appreciate the wrongfulness of his actions when he wrote the letter to the President. Kucharsky then said, however, that he would "qualify that a bit" and that he had "submitted a report to the court that stated that a definitive opinion regarding criminal responsibility or the appreciation of wrongfulness could not be given." Kucharsky explained this by stating that he was missing some "very important" information that Barton had been unwilling or unable to communicateSQBarton's motivation for sending the letter.

Barton recovered enough to stand trial. He was convicted under 18 U.S.C. § 871, which makes it a crime to send a letter in the mail threatening to kill the President. At trial, Barton raised the defense of insanity. Implicit in the jury's verdict of guilty was its finding that Barton was not shown to be criminally insaneSQunable to tell right from wrongSQwhen he wrote the letter.[4] Barton moved for a judgment of acquittal on the ground that the evidence established he was insane at the time the offense was

---

[4] The trial focused on the issue of insanity and the verdict form contained three options: guilty, not guilty, and not guilty by reason of insanity.

committed.  This motion was denied and Barton appeals.  His sole contention on appeal is that the evidence conclusively established his insanity defense.

## Discussion

Normally, "[i]n reviewing a motion for judgment of acquittal, we `consider the evidence as a whole taken in the light most favorable to the government, together with all legitimate inferences to be drawn therefrom to determine whether a rational trier of fact could have found guilt beyond a reasonable doubt.'" *United States v. Turner*, 960 F.2d 461, 465 (5th Cir. 1992) (citations and footnote omitted); *see United States v. Sanchez*, 961 F.2d 1169, 1173 (5th Cir.), *cert. denied*, 113 S. Ct. 330 (1992); *United States v. Newman*, 889 F.2d 88, 92 (6th Cir. 1989), *cert. denied*, 110 S.Ct. 2566 (1990).  Here, our review is different because insanity is an affirmative defense for which the defendant, not the government, bears the burden of proof at trial by clear and convincing evidence.  18 U.S.C. § 17 (1988).  Accordingly, we should reject the jury verdict in this respect only if no reasonable trier of fact could have failed to find that the defendant's criminal insanity at the time of the offense was established by clear and convincing evidence.[5]  We still view the

---

[5]    The federal insanity statute provides:

> "It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts.  Mental disease or defect does not otherwise constitute a defense."
> The defendant has the burden of proving the insanity

5

evidence in the light most favorable to the government since the government prevailed below.

Although there is substantial evidence that he was insane beginning in April of 1991, we think a reasonable fact finder could have concluded that Barton failed to prove by clear and convincing evidence that at the time of the offense in July 1991 he was by reason of his mental illness unable to appreciate the nature and quality or the wrongfulness of his acts.[6]

There is no definitive proof that Barton was unable to tell right from wrong at the time he wrote the letter. Although considerable evidence showed that he was mentally ill before and during his first month of incarceration in the Dallas jail, some of the evidence about Barton's illness from this period suggests that he may have been able to determine right from wrong. A week after Barton went to jail, around April 18, one of Barton's coworkers called the jail and spoke to Barton. Barton spoke to the worker and apologized for his actions and the problems he had caused. This suggests that Barton could appreciate the nature and quality and the wrongfulness of his conduct. Similarly, after his Aunt Darleen's visit, Barton wrote her a letter in which he indicated

---

defense by clear and convincing evidence." 18 U.S.C. § 17(a) & (b) (1988).

[6] Clear and convincing evidence is "that weight of proof which `produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts' of the case." *In Re Medrano*, 956 F.2d 101, 102 (5th Cir. 1992) (quoting *Cruzan v. Director, Missouri Dept. of Health*, 110 S.Ct. 2841, 2855 (1990).

that he was sorry and wanted to change his life.

The only evidence showing that Barton was so ill that he was unable to determine right from wrong, during the period when he wrote the letter in July, was the expert opinion of Dr. Kucharsky based on his examination of Barton about six months later. However, Kucharsky qualified his opinion saying that he lacked some important information from Barton. From Kucharsky's testimony it is clear that Barton was suffering the effects of a mental illness when Kucharsky examined him. It is less clear from Kucharsky that when the crime occurred six months previously, Barton was so ill that he could not determine right from wrong. Kucharsky noted that the effects of this disease normally last less than six months.

And, the fact that he was able to write the letter to the President and the letter to his aunt are suggestive that Barton may have appreciated the nature of his conduct.

Fact finders are entitled to make credibility determinations about witnesses, even expert witnesses. "[T]he questions of the *credibility* and *weight* of expert opinion testimony are for the trier of facts, . . . such testimony is ordinarily not conclusive even where it is uncontradicted." *Mims v. United States*, 375 F.2d 135, 140 (5th Cir. 1967). In light of the facts that Kucharsky's opinion was qualified and that no other testimony established Barton's mental condition in July 1991, when he wrote the letter, a reasonable fact finder could have concluded that Barton failed to prove, by clear and convincing evidence, that he was insane within the meaning of section 17(a) when he wrote the letter.

Barton argues that the fact that he signed his real name to

7

the letter and gave his return address proved that he was unable to tell right from wrong because sane people who commit illegal acts would not leave such obvious evidence of their conduct.  While it is true that a person's attempt to hide his commission of a crime suggests that the person knows the action is wrongful or illegal, *see United States v. Freeman*, 804 F.2d 1574, 1577 (11th Cir. 1986), we cannot say that disclosure of one's participation in an illegal act necessarily demonstrates an inability to appreciate the nature and quality or the wrongfulness of the conduct.  Sane people openly commit offenses and confess to crimes they could not otherwise be convicted of.  Barton's placing his name on the letter does not conclusively establish that he was then unable to determine right from wrong.

Barton notes that the government did not offer any rebuttal evidence or contrary expert opinions.  Because Barton, and not the government, had the burden of proof, there was no inflexible requirement for the United States to offer rebuttal evidence in the form of its own expert witnesses or otherwise.  *See, e.g. Mims v. United States*, 375 F.2d 135, 140-41 (5th Cir. 1967); *United States v. Bennett*, 908 F.2d 189, 195 (7th Cir.), *cert. denied*, 111 S.Ct. 534 (1990) ("The government is not required to rebut expert testimony with its own expert as it may accomplish the same result by presenting lay witnesses and other evidence and by undermining the defense expert's credibility through cross examination").

It is not sufficient here that Barton's evidence might appear to us, were we the finder of fact, to be clear and convincing.  We are not fact finders and do not assess the credibility of the

8

testimony or the weight of the evidence. These are the jury's responsibilities. *Sanchez*, 961 F.2d at 1173. This deference is particularly appropriate where the jury has found against a party having the burden of proof by clear and convincing evidence. As the D.C. Circuit said,

> "when insanity is raised as a defense to crime, a judgment of acquittal by reason thereof, we have emphasized, should be granted only in exceptional cases. And `in view of the complicated nature of the decision to be made SQintertwining moral, legal, and medical judgmentsSQit will require an unusually strong showing to induce us to reverse a conviction because the judge left the critical issue of criminal responsibility with the jury.' We think it clear in this case that the trial judge left it where it belonged." *Gaskins v. United States*, 410 F.2d 987, 990-91 (D.C. Cir. 1967) (citations and footnotes omitted).

### Conclusion

Because a reasonable jury could have found that Barton failed to prove by clear and convincing evidence that when he threatened to kill the President he was so mentally ill that he was unable to appreciate the nature and quality or the wrongfulness of his conduct, the district court did not err in denying Barton's motion for judgment of acquittal. Accordingly, Barton's conviction is

AFFIRMED.

9