# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

————————

No. 98-10371

————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JIMMIE LEE DIXON,

Defendant-Appellant.

————————————

Appeals from the United States District Court
for the Northern District of Texas

————————————

August 16, 1999

Before KING, Chief Judge, SMITH and
    BARKSDALE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Jimmie Dixon appeals his conviction of robbery, assault, kidnaping, and firearms violations, asserting that the district court erred by (1) allowing expert testimony on the ultimate issue of his insanity defense in violation of FED. R. EVID. 704(b); (2) refusing to give a jury instruction on the insanity defense; and (3) enhancing his sentence based on his causing "serious bodily injury" and his use of a firearm in a crime of violence. Because we reverse the refusal to instruct the jury on the insanity defense and remand for a new trial, we do not reach Dixon's challenges to his sentencing enhancements.

I.
A.

Dixon entered the emergency room of a VA hospital, approached hospital employee Josephine Adams, and ordered her to come with him. He then put his hand in his jacket and told her, "I've got a gun." When Adams began backing away, Dixon pulled out his gun and pointed it at her. He repeatedly threatened to shoot her, and she pleaded with him not to

do so. Eventually, Adams managed to escape by jumping through an interior window into a small room, in which she locked herself and her husband, John Adams. Before she locked the door, John Adams saw a man fitting Dixon's description holding a pistol-grip shotgun saying "something to the effect that get down or I'll blow your MF head off."

Other witnesses saw Dixon holding a pistol-grip shotgun and heard him tell everyone in the waiting area to lie down. Lonnie Shepard, a hospital employee, testified that he tried to run when he saw Dixon but that Dixon told him to get on the floor and get out his billfold.

Two ambulance drivers entered the emergency room lobby, having just dropped off a patient. Dixon confronted the drivers, Janet Shahan and David Dyer, with the shotgun and told them to get on the floor or he would "blow your heads off." After they complied, Dixon demanded Dyer's wallet, but Dyer had only his checkbook. Dixon threw down the checkbook but took a diamond engagement ring and five dollars from Shahan.

Dixon ordered Dyer and Shahan to get up, telling them that "we're going for a little walk." He warned that it would not bother him to shoot and kill them, noting that he had been in Vietnam and had killed people before. He said he was angry at the hospital because they had given him the run-around.

On their way down a corridor, Dixon asked another bystander, Charles Redd, whether he had any money for a soda. Redd said that he had no money; displaying his shotgun, Dixon replied, "Don't worry about it, this .410 [shotgun] will take care of it." Redd backed away.

When Dixon, Dyer, and Shahan made it outside the hospital, Dixon ordered Dyer to get the ambulance. He then put his arm around Shahan and pointed the shotgun at her throat. Dyer walked away, saw a police officer approaching, and heard the shotgun discharge.

When Dyer walked away, Dixon kissed Shahan and asked whether she was going to be "his woman" that night. Seeing a police car pull up, he pointed his shotgun at the departing Dyer and fired. Dixon then dragged her to his car, telling her that they had to hurry to avoid the police and that he had to cover her uniform with his jacket to make it harder to identify her. He forced her into the passenger seat of his car and sat down on the driver's side, keeping the shotgun on the armrest.

Driving away, Dixon lit up a marihuana joint, told Shahan to take a drag, and, after she did so without inhaling, ordered her to inhale. He had Shahan put duct tape over her eyes and drove in circles so she would not know where he lived. He also restrained her with handcuffs he had purchased two days earlier.

After they arrived at Dixon's house, he initially left Shahan blinded and handcuffed on his bed, explaining that he did not want her to be able to identify him by the things in his room. When he took the tape and handcuffs off, he suggested that they pretend they were married and that they had just gotten back from work. He took off her boots and began rubbing her feet, then told her to lie down on the bed, warning her to be careful because a gun was under the pillow. He lay down beside her, but got up to turn on a tape recorder to record their having sex. Then, after undressing himself and Shahan, he raped her. Shahan testified that "I didn't fight him because I

would have ended up dead. That's the way I felt."

Afterward, Dixon talked with Shahan, telling her that he had been in the military, and he showed her his bullets and grenade. He talked about how he was angry at the government and that they had not given him his medication. He told her that he wanted to kill a doctor and that he was mad at the police. He also said that he had three missions, one of which was to take a hostage. Finally, he told Shahan that he was "bipolar."

During the night, Dixon wanted to go out for beer. He gave Shahan some of his clothes to wear, telling her that it would make it harder to identify her. He also blindfolded and handcuffed her again and put her in his car. At the store, he took off the blindfold and handcuffs but gave her sunglasses to wear and instructed her to act as though she were his girlfriend.

Dixon bought some beer and cigars. Returning to his car, he did not handcuff or blindfold Shahan again, but put duct tape over the sunglass lenses, which allowed her to see some of the landmarks near Dixon's house. Police later used this information to apprehend Dixon. During their drive, he talked repeatedly about how he was proud to be getting away with it and that he would not be caught.

After returning to Dixon's house, Dixon asked Shahan whether they could have a relationship. Shahan tried to appease him by giving him her telephone number. He called the number and left a voicemail message with both of their voices on it. He also called his brother and told him not to come into Dixon's room because Dixon had a friend over. When a car later drove by, Dixon listened to see whether it was his brother. He boasted, however, that he did not care whether it was the police, because "as long as I have you as a hostage, I can do anything."

Dixon told Shahan that they would have sex one more time before he would drop her off, because he had to go to work later. He raped her again, then returned her original clothes but removed her knife, driver's license, and a $100 bill. He also kept her underwear as a memento. He said he would keep her license for three days and that he hoped they would call each other. Finally, before leaving, he had her inscribe a Valentine's Day card.

Driving Shahan back to her workplace, Dixon again had her wear the taped sunglasses and told her that the "alibi" would be that she was his girlfriend. He explained that he would drop her off at a nearby convenience store, but he ended up dropping her off at a pay phone some distance away, saying that he did not want to drop her off right in front of the store because that would look suspicious.

Shahan walked to her workplace and went in. Later, she was taken to a hospital and underwent a pelvic examination, which revealed sexual intercourse within the previous four to six hours.

The police, acting on information provided by Shahan, arrested Dixon at his house the same morning he had dropped Shahan off. They found a number of identifying items, including Shahan's underwear, the grenade, the handcuffs, duct tape, and a cassette recorder. Dixon's fingerprints were found on the sunglasses and on pieces of duct tape.

B.

Dixon was indicted on five counts: (1) robbing Janet Shahan by force, violence, and intimidation in violation of 18 U.S.C. §§ 7(3)[1] and 2111; (2) attempting to rob Dyer in violation of the same statute; (3) assaulting Dyer with a sawed-off shotgun in violation of 18 U.S.C. §§ 7(3) and 113(a); (4) using and carrying a gun in relation to a kidnaping in violation of 18 U.S.C. § 924(c)(1); and (5) kidnaping Shahan for the purpose of committing aggravated sexual abuse in violation of 18 U.S.C. § 1201(2). The defense offered medical records detailing Dixon's history of mental illness and showing that he had been diagnosed with acute schizophrenia beginning in 1976. Later examinations during the 1980's concluded he had "chronic undifferentiated schizophrenia," "disorganized schizophrenia," "chronic paranoid schizophrenia," "schizoaffective schizophrenia," "manic bipolar disorder," "bipolar disorder," and "mixed bipolar disorder." The diagnosis of "mixed bipolar disorder" was made by a doctor at the federal detention center the day after Dixon was arrested.

Having entered these records into evidence, however, Dixon's counsel did not call any expert witnesses to testify regarding it, but, instead, simply argued that "showing the lengthy history and diagnosis of his mental illnesses, and the description of those mental illnesses by the doctor, and the timing of the evaluations that I was able to put before the Court" raises the issue of whether Dixon was legally sane when he committed the acts of which he was charged. Therefore, most of the discussion of

Dixon's medical history occurred during the cross-examination of Dr. James Wolfson, the government's expert mental health witness.

Wolfson, a forensic psychiatrist at the U.S. Medical Center for Federal Prisoners, had originally been appointed by the district court to examine Dixon's competence and criminal responsibility, to assess his ability to stand trial. Wolfson concluded, based on personal examination and a review of Dixon's medical history, that Dixon was competent to stand trial. Wolfson testified that he did not believe that Dixon was suffering from a severe mental disease on the day of the crimes. He also stated that he believed Dixon was able to appreciate the nature and quality or the wrongfulness of his acts. Dixon's counsel objected, claiming that this testimony answered the ultimate issue of Dixon's sanity at the time of the offense, in violation of FED. R. EVID. 704(b).

The court overruled the objection but later reversed course and issued a curative instruction to disregard this part of Wolfson's testimony. The court also conducted its own examination of Wolfson and asked whether a person suffering from Dixon's mental illnesses can still appreciate the nature and quality or wrongfulness of his acts. Wolfson answered that having such mental illnesses does not preclude someone from appreciating wrongfulness.

Under further questioning by the court, Wolfson also testified that looking at one's actions is more important than are personal medical records when determining whether he had the ability to appreciate the wrongfulness of his conduct. Wolfson advised that some of Dixon's actions indicated that he was not suffering from any of his illnesses when he

---

[1] Because a VA hospital is within the special maritime or territorial jurisdiction of the United States, 18 U.S.C. § 7(3) gives the United States jurisdiction to prosecute Dixon's robbery and assault crimes.

committed the criminal acts. Dixon's counsel again objected under rule 704(b) but was overruled. The jury found guilt on all counts.

## II.

The decisive issue is whether the court properly refused to allow the jury to consider Dixon's insanity defense. Dixon argues that the court erred in allowing Wolfson to testify regarding the constituent elements of the federal insanity defense set forth in § 17(a).[2] On the basis of Wolfson's testimony, the court refused to submit an insanity instruction.

This court has not yet decided what quantum of evidence is sufficient to constitute a jury question on insanity under § 17. The issue is complicated by the fact that the sufficiency of the evidence for an insanity defense under § 17 depends largely on the admissibility of expert testimony under rule 704(b).

### A.

We review challenges to evidentiary rulings for abuse of discretion. *United States v. White*, 972 F.2d 590, 598 (5th Cir. 1992). To qualify for reversal, the abuse of discretion must create a likelihood of prejudice to the defendant, and the substantial right at issue must be made known to the court. *United States v. Tansley*, 986 F.2d 880, 886-87 (5th

---

[2] The subsection reads,

> It is an affirmative defense to a prosecution under any federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

18 U.S.C. § 17(a).

Cir. 1993).

### 1.

We first consider whether the admission of expert testimony on Dixon's insanity defense was harmless. Error is harmless if, in light of the whole record, the contested evidence did not contribute to the verdict. *See United States v. Dickey*, 102 F.3d 157, 163 (5th Cir. 1996). If we were to uphold the decision to withhold the insanity defense, *see* part II.B., *infra*, then none of the expert testimony challenged in this section could have contributed to the verdict, because the question of sanity was not before it. Because, however, the court relied in part on its assessment of the expert testimony in withholding the insanity instruction, resolving the issue of the admissibility of the testimony may decide the propriety of giving the insanity instruction.

We conclude that the district court relied on improperly admitted expert testimony to withhold the insanity instruction, so any error in admitting the evidence cannot be harmless. Consequently, we consider Dixon's rule 704(b) challenges before addressing the need for an insanity instruction.

### 2.

Rule 704(b) prohibits an expert witness, testifying with respect to mental state or condition, from stating "an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of . . . a defense . . . ."[3]

---

[3] The rule reads,

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an
> (continued...)

Therefore, to analyze whether an expert's testimony is admissible under rule 704(b), we must decide what are the constituent elements of an insanity defense under § 17, for rule 704(b) prohibits an expert from giving an opinion or inference on any such element.

Relying on the plain language of the statute, Dixon asserts that there are two constituent elements of the insanity defense: (1) that the defendant was suffering from a severe mental illness at the time of his criminal conduct and (2) that this illness rendered him unable to appreciate his wrongdoing at that time. This reading means there are two "ultimate issues" for purposes of rule 704(b) that are for the jury alone to decide.

In *United States v. Levine*, 80 F.3d 129, 134 (5th Cir 1996), this court, in considering the insanity defense, identified only the second elementSSthe ability to appreciate wrong-doingSSwhen discussing rule 704(b) ultimate issues. "In the case where the defendant asserts the affirmative defense of insanity, the ultimate issue is whether at the time of the crime the defendant 'appreciated the nature and quality or the wrongfulness of his acts.'" *Id.* at 134 (quoting *United States v. Dotson*, 817 F.2d 1127 (5th Cir. 1987), *opinion on rehearing*, 821 F.2d 1034 (5th Cir. 1987)). Though the *Levine* court did not expressly analyze whether the "severe mental illness"

---

(...continued)
> opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

FED. R. EVID. 704(b).

element also constitutes an ultimate issue, it strongly implied that only the "wrongdoing" element of the insanity defense is an ultimate issue for purposes of rule 704(b).

For instance, the court noted, without further comment, that the defendant had presented expert testimony that he was suffering from a severe mental illness at the time of his criminal conduct. The government then put on its own expert who testified to the contrary and even stated that someone suffering from the alleged disorder would not have acted in the manner of the defendant. The district court allowed this testimony, and the *Levine* court affirmed, stating that this testimony "did not contain an opinion or an inference as to whether the defendant did or did not have the mental state or condition constituting an element of the . . . defense thereto." *Levine*, 80 F.3d at 135. The challenged statement, however, did contain a necessary inference as to whether the defendant was suffering from a severe mental illness.

Thus, *Levine*'s holding makes sense only if the question whether the defendant was suffering from a severe mental illness at the time of the crime is *not* an ultimate issue subject to rule 704(b)'s prohibition. Because, however, *Levine* did not squarely address the question, it does not bind us.

The plain language of § 17 instructs that the defendant must show that (1) "as a result of a severe mental disease" (2) he "was unable to appreciate the nature and quality or the wrongfulness of his acts." This language supports Dixon's reading and is partially supported by the legislative history. Congress appears to have added the "severe mental disease" requirement "to emphasize that non-psychotic behavior disorders or neuroses such

as an 'inadequate personality,' 'immature personality,' or a patter of 'antisocial tendencies' do not constitute the defense." S. Rep. 98-225, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3411. Congress could not have achieved its goal of limiting the insanity defense to severe mental diseases without requiring the defendant to show he was suffering from such a "severe mental disease."

The matter is complicated, however, because Congress plainly endorsed having experts testify on whether defendants are suffering from a mental illness at the time of their criminal acts. Rule 704(b) was enacted as part of the same bill that enacted § 17. On the next page of the same Senate report discussing how "severe mental illnesses" must be shown for a defendant to use the insanity defense, Congress stated: "Psychiatrists, of course, must be permitted to testify fully about the defendant's diagnosis, mental state and motivation (in clinical and common sense terms) at the time of the alleged act . . . ." S. Rep. No. 98-225, *reprinted in* 1984 U.S.C.C.A.N. 3412. Thus, Congress appeared to see no conflict between (1) requiring a defendant to show a severe mental illness as a constituent element of his insanity defense, (2) prohibiting experts from testifying to ultimate issues of an insanity defense; and (3) encouraging experts to testify about whether a defendant suffered from a mental illness at the time of the criminal conduct.

It may seem illogical to preclude expert witnesses from giving a diagnosis of mental illness. An expert psychiatrist can assist a jury by giving an opinion in his area of expertise: whether a patient is suffering from a particular mental disease. Congress apparently did not intend to prohibit the expert testimony that could assist the jury to reach a verdict. We are reminded, however, that "the meaning of a statute is not conclusively established by its legislative history," and "the legislative history of a statute may not compel a meaning at variance with its plain language." 73 AM. JUR. 2D *Statutes* § 151 (1998). We cannot ignore the plain language of § 17 and rule 704(b) in favor of the legislative history.

On the other hand, the plain language of rule 704(b) does not necessarily prohibit testimony on all elements of a defense, but only on "whether the defendant did or did not have the *mental state or condition* constituting the element of the . . . defense . . . ." Because § 17 requires a defendant to show "*as a result* of a severe mental disease" that he was unable to appreciate wrongdoing, the showing of a severe mental disease is necessary only as part of the larger element of the inability to appreciate wrongdoing.

In other words, the "mental state or condition" that constitutes an element of the defense is the *inability to appreciate wrongdoing*. The "severe mental disease" requirement is subordinate to this overall element and should not be considered a subject prohibited by rule 704(b). An expert is therefore free to testify as to whether the defendant was suffering from a severe mental illness at the time of the criminal conduct; he is prohibited, however, from testifying that this severe mental illness does or does not prevent the defendant from appreciating the wrongfulness of his actions.

3.

Dixon avers that the district court violated rule 704(b) when it allowed Wolfson to testify that (1) Dixon was able to appreciate the wrongfulness of his conduct; (2) a person suffering from the diseases mentioned in Dixon's medical records could appreciate the wrongfulness of his acts; and (3) Dixon was not suffering from a severe mental disease or defect at the time of the alleged crimes. He argues that all of this testimony impermissibly resolves the "ultimate issues" that constitute his insanity defense.

a.

Wolfson testified that he "found nothing in the records to indicate that Mr. Dixon would have been unable to appreciate the nature and quality or the wrongfulness of his conduct in that or any other time period." Because "the ultimate issue is whether at the time of the crime the defendant 'appreciated the nature and quality or the wrongfulness of his acts,'" *see Levine*, 80 F.3d at 134, Wolfson's testimony violated rule 704(b).

The government agrees but maintains that the court cured the error by instructing the jury to disregard the portion of Wolfson's testimony assessing whether Dixon understood the wrongfulness of his actions.[4] Because juries are presumed to follow instructions, the instruction sufficiently cured this error. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987).

                    b.

Dixon maintains, however, that this curative instruction did not reach the court's own prejudicial questions to Wolfson. As we have stated, after the government's redirect, the

---

[4] The instruction read as follows:

    There was a specific question asked of the doctor about whether or not he believed the defendant was unable to appreciate the nature and quality or the wrongfulness of his acts, and I allowed him to give his opinion on that.

    And I'm instructing you at this time to disregard that opinion for the following reason: that question is the ultimate question for the jury . . . . I'm going to instruct you now to disregard the witness's answer to that question and don't consider it for any purpose whatsoever.

court conducted its own brief examination:

    THE COURT: Can a person suffering from any or all of those [mental illnesses] still, nevertheless, be able to appreciate the nature and quality or the wrongfulness of his acts?

    [OBJECTION RAISED AND OVERRULED]

    . . .

    WOLFSON: The mere presence of one of these illnesses would not automatically prevent them from being able to do that.

Dixon claims that this testimony also impermissibly encroached on the jury's authority to decide the ultimate issue under rule 704(b).

The government responds that rule 704(b) prohibits only testimony on whether the defendant had the requisite mental state and not on whether a hypothetical person suffering from a disease can have the requisite mental state. The government finds authority in *United States v. Brown*, 32 F.3d 236 (7th Cir. 1994), which permitted an expert to testify that a hypothetical person suffering from the defendant's disease could understand the wrongfulness of his acts.

The government also points out that rule 704(b)'s legislative history expressly anticipates such "hypothetical" testimony. "Under this proposal, expert psychiatric testimony would be limited to presenting and explaining their diagnoses, such as whether the defendant had a severe mental disease or defect and what the characteristics of such a disease or defect . . . may have been." 1984 U.S.C.C.A.N.

at 3412. The government argues that by testifying that a defendant suffering from Dixon's diseases could distinguish between right and wrong, Wolfson was properly describing "the characteristics of" Dixon's mental illnesses, as Congress intended.

This court, following the majority of circuits, has held that "under Rule 704(b) hypothetical questions mirroring the fact patterns of the evidence in the trial case are violative of the rule when the answering testimony contains a necessary inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." *Levine*, 80 F.3d at 134. The *Levine* court reviewed the admission of expert testimony of whether the "facts similar to those in evidence were consistent with the conduct of a hypothetical person suffering a severe manic episode." *Id.* at 135.

Because the testimony did not discuss or raise inferences about the defendant's ability to recognize wrongdoing at the time of the act, the *Levine* court affirmed admission of the testimony. In other words, the expert could testify about whether the defendant exhibited characteristics of a person suffering from a mental illness but could not testify that a hypothetical person suffering from the same mental condition and committing the same acts as the defendant would or would not be able to recognize wrongdoing, because this *is* an element of the insanity defense.

The cases relied on in *Levine* expressly prohibit an expert from using "hypothetical" testimony to assess the defendant's mental state or condition. In *Manley*, the defendant's expert testified that a hypothetical person suffering from the same mental illness as the defendant could not appreciate the nature and quality or the wrongfulness of his actions. The district court excluded this testimony, and the court of appeals affirmed. "Defense counsel's hypothetical not only assumed facts which identified the defendant, but directly tracked the language of the insanity statute . . . . Whether such question was posed in the form of a hypothetical is immaterial." *Manley*, 893 F.2d at 1225.[5]

---

[5] *See also United States v. Boyd*, 55 F.3d 667, 669 (D.C. Cir. 1995) (reversing admission of expert testimony because "the expert was allowed to address a hypothetical that was a carbon copy of the matter before the jury, thus effectively giving a forbidden opinion on the case at hand"); *United States v. Dennison*, 937 F.2d 559, 565 (10th Cir. 1991) (affirming exclusion of expert testimony that alcohol and drug consumption by a person suffering from a borderline personality disorder renders him incapable of forming specific intent).

The disapproval of hypothetical expert testimony in these cases, however, does not necessarily require us to reverse here, for the instant district court asked a slightly different kind of hypothetical: whether a person suffering from Dixon's disease *could* still "be able to appreciate the nature and quality or the wrongfulness of his acts." Wolfson answered that the illness alone does not prevent a defendant from understanding his wrongdoing. This answer allowed the jury both to accept the expert's opinion and to find that in this *particular* case, Dixon did not understand his wrongdoing. Instead of testifying that the defendant did or did not appreciate wrongdoing, Wolfson merely stated that the presence of a mental illness does not answer, or contain a necessary inference that would answer, the ultimate issue. Therefore, the court's question was permissible under rule 704(b).

This reasoning is supported by *United States v. Davis*, 835 F.2d 274, 276 (11th Cir. 1988), which has facts similar to the instant case. In *Davis,* the district court asked the testifying expert "whether a finding that a person suffers from multiple personalities, in and of itself, indicates that a person is unable to understand what he was doing." As here, the expert responded in the negative. *See id.* at 276. The court held that the "testimony did not include an opinion as to Davis' capacity to conform his conduct to the law at the time of the robbery, and thus was not inadmissible." Id.[6]

Therefore, the district court did not abuse

---

[6] *Manley* expressly distinguished its holding from that in *Davis*, explaining that the question in *Davis* "was permissible because it sought an explanation of the disease and its typical effect on a person's mental state." *Manley*, 893 F.2d at 1224.

its discretion by eliciting Wolfson's testimony on how Dixon's claimed illnesses *could* affect one's ability to appreciate wrongdoing. As long as the expert leaves the ultimate issue unresolved, his testimony is admissible.

c.

The government also asked Wolfson whether Dixon was suffering from a "severe mental disease or defect" on the dates of the criminal conduct. Wolfson responded, "My opinion is that he was not suffering from a severe mental disease or defect on those days." Dixon's counsel objected but did not receive a curative instruction. Relatedly, the court asked Wolfson about what aspects of Dixon's actions should be analyzed in answering the ultimate issue of his ability to appreciate his wrongdoing. In response, Wolfson pointed to various statements made by Dixon that, in his opinion, showed he was not suffering from a mental illness at the time of the acts.

Dixon argues that this testimony impermissibly states an opinion on an element of his insanity defense: whether "at the time of the commission of the acts constituting the offense, the defendant, *as a result of a severe mental disease or defect*, was unable to appreciate the nature and quality or the wrongfulness of his acts." § 17(a) (emphasis added). Because, however, as we have concluded, testimony as to whether a defendant was suffering from a mental illness at the time of the criminal conduct is not testimony on an "ultimate issue," there is no error in the admission of Wolfson's testimony that Dixon was not suffering from a mental disease or illness at the time of Dixon's criminal conduct.

B.

Dixon requested an instruction that would have permitted the jury to find him not guilty

11

by reason of insanity. He claims the court erred by refusing to give the instruction, thereby improperly depriving him of his ability to assert an insanity defense.

### 1.

We usually review jury instructions for abuse of discretion. *See United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998). Furthermore, "[t]his court must view the evidence in the light most favorable to [the defendant] in determining if there is sufficient evidentiary foundation for a requested instruction." *United States v. Giraldi*, 86 F.3d 1368, 1376 (5th Cir. 1996) (citing *United States v. Lewis*, 592 F.2d 1282, 1286 (5th Cir. 1979)). A court abuses its discretion in denying a requested instruction if (1) the requested instruction is a substantively correct statement of the law; (2) the requested instruction is not substantially covered in the charge given to the jury; and (3) the omission of the instruction would seriously impair the defendant's ability to present his defense. *See United States v. Storm*, 36 F.3d 1289, 1294 (5th Cir.1994). In the context of reviewing a denial of a proposed jury instruction on mental condition, however, some courts have applied the *de novo* standard of review, reasoning that such a determination resolves a question of law.[7]

---

[7] *See United States v. Denny-Shaffer*, 2 F.3d 999, 1016 (10th Cir. 1993) ("In determining whether error was committed in rejecting the defense and refusing to instruct on it under 18 U.S.C. § 17, our review is de novo."); *United States v. Long Crow*, 37 F.3d 1319, 1323 (8th Cir. 1994) ("[W]e conclude that whether there is sufficient evidence to submit an affirmative defense of insanity to the jury is a question of law for the court."). *But see United States v. Whitehead*, 896 F.2d 432, 434 (9th Cir. 1994) (noting that Ninth (continued...)

The application of the less deferential standard of review to a decision that there is insufficient evidence to support a jury instruction makes sense in light of reduced deference afforded to rulings that take decisions from the jury. In the case of a motion for judgment of acquittal, for instance, we apply the same standard as did district court in reviewing the sufficiency of evidence. *See United States v. Baytank (Houston), Inc.*, 934 F.2d 599, 616 (5th Cir. 1991). Because "sufficiency of the evidence" is generally considered a legal issue, we review Dixon's request for an insanity instruction, as a question of law, *de novo. Accord* 2 STEVEN CHILDRESS & MARTHA DAVIS, FEDERAL STANDARDS OF REVIEW § 11.29, at 11-120 & n.11(1997).

### 2.

Before the passage of § 17, a defendant received a jury instruction on insanity "if there [was] some evidence supporting the claim of insanity . . . . This means only slight evidence." *Blake v. United States*, 407 F.2d 908, 911 (5th Cir. 1969) (en banc). The *Blake* "slight evidence" rule was adopted, however, when a defendant could win an acquittal by reason of insanity if the government failed to show proof of *sanity* beyond a reasonable doubt. *See Blake*, 407 F.2d at 910-11 (quoting *Davis v. United States*, 160 U.S. 469, 487-88 (1895)). Section 17 explicitly shifted the burden of proof by requiring a defendant to show by "clear and convincing evidence" that he is not guilty by reason of insanity.[8] This

---

(...continued)

Circuit has not resolved intra-circuit conflict over whether appellate review is for abuse of discretion or *de novo*).

[8] "The defendant has the burden of proving the (continued...)

circuit has not yet considered the question of how § 17 has changed the quantum of evidence necessary for a defendant to receive a jury instruction on insanity.[9]

In *United States v. Owens*, 854 F.2d 432 (11th Cir. 1988), the court held that § 17's new burden of proof ended the applicability of the *Blake* rule. Because the Supreme Court has instructed that "a higher burden of proof should have a corresponding effect on the judge when deciding to send the case to the jury . . .,"[10] the *Owens* court held that "a federal criminal defendant is due a jury instruction on insanity when the evidence would allow a reasonable jury to find that insanity has been shown with convincing clarity."

In adopting this higher standard, the *Owens* court emphasized that a district court must construe the evidence most favorably to the defendant and that the "clear and convincing" standard does not call for the highest levels of proof. Following the formulation established

in Arizona under a state law similar to § 17, the court explained that the defendant asserting an insanity defense is "not required to eliminate ambiguity from his proof or to instill certainty in the minds of the jurors." Rather, "his lesser burden [is] to persuade the jury that his position on the psychiatric issue is highly probable." *Id.* at 436 n.8 (quoting *State v. Renforth*, 746 P.2d 1315 (Ariz. Ct. App. 1987)). Therefore, a court must give an insanity instruction "[i]f the evidence would permit the jury to find to a high probability that defendant was insane." *Id.* at 436.[11]

---

(...continued)

defense of insanity by clear and convincing evidence." 18 U.S.C. § 17(b).

[9] This court has applied the "clear and convincing" standard when reviewing challenges to the sufficiency of the evidence supporting a jury conviction. *See*, *e.g.*, *United States v. Barton*, 992 F.2d 66 (5th Cir. 1993). The posture of *Barton*, however, required that the evidence be construed in the light most favorable to the government and does not bear on what quantum of evidence is needed to create a jury question.

[10] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-52 (1986) (discussing relationship between burden of proof and jury consideration in context of summary judgment, directed verdicts, and judgments of acquittal).

---

[11] This articulation of the "clear and convincing" standard does not differ from this court's definition of that phrase in *Barton*, in which we emphasized that a fact-finder operating under this standard must "come to a clear *conviction*, without hesitancy, of the truth of the precise facts." *Barton*, 992 F.2d at 69 n.6 (emphasis added). Such a *conviction*, however clear, may still fall short of the certainty that the *Owens* court said a defendant is not required to establish. In this way, *Barton*'s "clear conviction" language can be seen as another version of *Owens*'s "highly probable" articulation of the clear and convincing standard.

The real difference between *Barton* and the instant case lies in the manner in which we must construe the inferences from the evidence. In *Barton*, the court, in reviewing the sufficiency of the evidence, construed the evidence in the light most favorable to the government. Because we have a duty to respect the jury's credibility judgments and inferences, we must construe the evidence in the light most favorable to Dixon, because the district court did not allow the jury to consider the insanity question.

The approach of the *Owens* court has been adopted by every circuit that has considered this issue.[12] Following the other circuits, we do not see any basis for disagreeing with the approach outlined in *Owens*, so we adopt the *Owens* "convincing clarity" standard for the submission of instructions on the insanity defense.

3.

Deciding on the quantum of evidence needed to support an insanity instruction, however, is easier than applying that standard to the case at hand. Dixon submitted detailed evidence showing that he had a long history of mental illness. Specifically, two weeks before the crime, he was diagnosed as having suffering from a "bipolar disorder," and a government doctor made the same diagnosis the day after Dixon was apprehended. Dixon reasons that the combination of his history of mental illness leading up to the event and a diagnosis that he was suffering from a mental illness immediately after the event provides sufficient evidence for a jury to infer his insanity during the commission of the crimes.[13]

_____

[12] *E.g.*, *Long-Crow*, 37 F.3d at 1323-25 (8th Cir. 1994) (adopting *Owens* standard); *Denny-Shaffer,* 2 F.3d at 1015-16 (same); *Whitehead*, 896 F.2d at 435 (same); *see also* 26 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 630.32[2][b], at 630-59 n.16 (3d ed. 1998); 118 A.L.R. FED. 265 § 10 (1994).

[13] The government rightly points out, however, that Dixon incorrectly relies on *Volanty v. Lynaugh*, 874 F.2d 243 (5th Cir. 1989), which addressed the question whether a defendant has made a sufficient showing to entitle him to expert psychological assistance and examination at trial. This "threshold" standard is less demanding than is (continued...)

The court rejected Dixon's request for an insanity instruction, explaining that "merely putting these [medical] records in, coupled with an expert witness who takes a contrary view of them, doesn't present sufficient evidence for the burden that's placed upon the defendant asserting the defense under the standard of proof the law provides." The court reasoned that (1) the only expert testimony at trial did not support Dixon's insanity theory, and (2) medical records cannot provide sufficient evidence without expert testimony to explain them.

The government adds that there is little evidence that Dixon did not understand what he was doing or that what he was doing was wrong. For instance, he threatened to shoot several people at the hospital to gain their compliance. Additionally, he blindfolded Shahan, drove her around in circles, and made her change clothes to avoid detection.

According to the government, these actions indicate that Dixon understood what he was doing was wrong and that he needed to threaten people to get cooperation. Therefore, the government asserts that no rational jury could have concluded, by clear and convincing evidence, that he was unable to appreciate the wrongfulness of what he was doing.

a.

Dixon is correct that the court erred to the extent it relied on the testimony of an expert witness on the "ultimate issue" to withhold a question from a jury. The court explained that

the only expert testimony is the *govern-*

_____

(...continued)
the "convincing clarity" burden needed to justify a jury instruction.

14

*ment's witness who unequivocally stated* that the records do not indicate any evidence whatsoever that the defendant on or about February 9, 1997, suffered from a severe mental disease or defect, much less *was in a state of mind that he could not understand or was unable to appreciate the nature and quality or the wrongfulness of his acts* . . . . [Emphasis added.]

As we have discussed, rule 704(b) does not permit an expert to testify to the "ultimate issue" in an insanity defense. In Dixon's case, the ultimate issue is whether he was unable to appreciate the nature and quality or the wrongfulness of his acts. *See* 17(a). The court erred in admitting this testimony (though it later corrected for it), and it erred again by relying on this testimony to determine whether Dixon should receive an insanity instruction. Because the "at least theoretical effect of Rule 704(b) is to make it possible for juries to find a defendant not guilty by reason of insanity even if no expert would draw that same conclusion," *United States v. West*, 962 F.2d 1243, 1247 (7th Cir. 1992), the court could not rely on Wolfson's opinion that Dixon could appreciate the nature of his wrongdoing to withhold the insanity instruction from the jury.[14]

---

[14] *Accord West*, 962 F.2d at 1247 ("A judge may take [an insanity determination] away from the jury . . . if the admissible evidence, *not including psychiatrists' opinions*, would not permit a reasonable jury to return a verdict of insanity.") (emphasis added).

b.

Still, the court provided another reason for finding the evidence insufficient for a jury instruction on insanity, specifically stating that the "medical records in and of themselves would need expert testimony to explain." In other words, the court ruled that medical records alone, without supportive admissible expert testimony explaining what they mean, cannot meet the "convincing clarity" standard articulated in *Owens*.

We are not aware of any other case in which a court has refused to give an instruction on insanity because of the lack of expert testimony *explaining* medical records on mental illness. Courts have emphasized, however, that merely identifying the existence of a mental illness does not necessarily create a jury question on the insanity defense.

In *Denny-Shaffer*, the court refused to give an insanity instruction despite expert testimony that the defendant was suffering from multiple personality disorder ("MPD") at the time of the crime. The district court held that even though an alter ego personality was in control during the commission of the crime, because the alter ego personality knew that it was acting wrongfully, no insanity instruction was required. In reversing, the court of appeals was careful to note that "a factual showing or jury finding that a defendant suffers from MPD, without more, [does not] automatically satisf[y] [§ 17's] requirements." *Denny-Shaffer*, 2 F.3d at 1017 n.18. Instead, in finding an insanity instruction appropriate, the court of appeals explicitly relied on expert testimony establishing that (1) the defendant was suffering from MPD at the time of the crime and (2) the host personality was unaware of the

criminal conduct. *Id.*[15]

We find this reasoning persuasive. The "convincing clarity" burden for a defendant seeking a jury question requires more than just a showing that he has been diagnosed with a mental illness at some point in his life. Rather, he must provide sufficient evidence so that a rational jury could conclude, by clear and convincing evidence, that he was unable to appreciate his wrongdoing as a result of a severe mental illness.

Simply submitting evidence of Dixon's previous mental illnesses could not meet the "convincing clarity" burden set out in *Owens*. Even the fact that he was diagnosed with a mental illness immediately after his criminal conduct does not, by itself, create a jury question. Rather, in these circumstances, to support the elements of his insanity defense, his history of mental illness must be further developed by some testimony.

For instance, some evidence must be presented that would allow a rational jury to infer that Dixon was unable to appreciate his wrongdoing at the time of his criminal conduct. Obviously, this means that some kind of expert testimony is needed to explain the relationship between Dixon's medical history and his criminal actions. Helpful testimony would describe the characteristics of his mental illnesses and the effect of such illnesses on his ability to appreciate wrongdoing. This type of testimony could assist a jury in resolving the "ultimate issue" in an insanity defense, and it is hard to imagine how the jury could adequately resolve these issues without such assistance.

Accepting that the medical records alone are insufficient, Dixon maintains that he did connect his medical history to his actions through cross-examination of Wolfson. This raises, however, the question whether Dixon can create a jury question on his sanity based solely on medical records explained by a hostile expert witness. Because the thrust of rule 704(b) reserves the ultimate issue for the jury, we conclude that the expert witness's hostility to the defendant does not preclude a jury question.

During the cross-examination of Wolfson, Dixon's attorney established that Dixon had been repeatedly diagnosed with severe mental illnesses—specifically, schizophrenia and bipolar disorders—over a twenty-year period, and these illnesses sometimes manifested themselves in hallucinations and delusions—for example, Dixon's reporting that he heard "voices" that no one else could hear.

Dixon received medication for his mental illnesses both before the incident and after he was placed in federal custody. The record also showed that Dixon may have been off his medication for two days before his criminal acts. Wolfson admitted that bipolar disorder could go into remission, even without medication, but that usually medication is needed to stay healthy. He also explained that Dixon was diagnosed with mixed bipolar disorder just ten days before his criminal conduct. This diagnosis indicated, according to Wolfson, that Dixon was going through manic and depressive phases.

---

[15] *See also United States v. Cameron*, 907 F.2d 1051, 1060 (11th Cir. 1990) ("The evidence that [defendant] has been diagnosed as suffering from schizophrenia at various times in her life does not necessarily mean that she was legally insane either at those times or during the time period over which she allegedly committed the crimes charged.").

The doctor who examined Dixon on January 27 opined that he was not able to function in normal employment and even suggested that he consider retirement so as to minimize social contacts. The doctor who examined Dixon the day after his detention also opined that he had a bipolar disorder and appeared "agitated, delusional, and hostile." Dixon's attorney had Wolfson describe Dixon's account of his encounter with Shahan, from which a jury could infer that Dixon was having delusions about Shahan's feelings toward him.[16]

Drawing all inferences in the light most favorable to Dixon, the jury rationally could have concluded that, based on clear and convincing evidence from Wolfson's description and explication of the medical records, Dixon was suffering from a severe mental illness at the time of the crime. This illness, as explained through cross-examination, could have prevented him from knowing that his conduct was wrongful if, for instance, he truly believed in his delusional account of his evening with Shahan.

While the "clear and convincing" standard raises the burden on the defendant who seeks a jury instruction on insanity, it does not "call for the highest levels of proof." *Owens*, 854 F.2d 432. Recalling that the court must construe the evidence, and all inferences, drawn in the light most favorable to the defendant, we must require an insanity instruction "[i]f evidence would permit the jury to find to a high probability that defendant was insane . . . ." *Id.* We observe that the *Owens* court required a jury instruction based merely on an expert's diagnosis of the defendant as "a psychotic who would lose touch with reality." *Id.* at 436. We therefore do not find our application of the *Owens* standard in conflict with the approach used in *Owens*.

c.

In sum, the district court cannot rely on the inadmissible expert testimony that Dixon was able to appreciate his wrongdoing at the time of the criminal conduct when determining whether an insanity instruction is needed. The court erred to the extent it relied on Wolfson's testimony on the latter element to withhold the jury instruction.

We note that a court can still withhold the insanity instruction if it concludes that the relationship between a defendant's mental illness history and his criminal conduct has not been explained or examined in any meaningful way. In this case, however, the cross-examination of Wolfson did explain how Dixon's mental illnesses might have manifested itself on the day he committed his criminal acts and how these illnesses might have prevented him from realizing the wrongfulness of his actions. Wolfson's explanation of Dixon's medical records, even though ultimately hostile to Dixon's interests, provided sufficient evidence to create a jury question on Dixon's sanity.

Therefore, we REVERSE and REMAND for the district court to grant Dixon a new trial and for further proceedings in accordance with this opinion.

---

[16] For instance, Dixon later explained to the doctor that he believed Shahan wanted to have a romantic encounter with him because of her dissatisfaction with her own relationship. He also claimed that she encouraged his sexual advances and sought to see him again. He claims that he kept her underwear as a romantic souvenir and that he gave her a card for Valentine's Day.