# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Remanded December 23, 2002

## STATE OF TENNESSEE v. LUIS ANTHONY RAMON

**Direct Appeal from the Circuit Court for Henry County**
**No. 12937    Julian P. Guinn, Judge**

---

**No. W2002-03084-CCA-RM-CD  - Filed October 29, 2003**

---

The Henry County Grand Jury indicted the fifteen-year-old Defendant for first degree murder for the stabbing death of his aunt. The Defendant was tried as an adult and convicted of the charged offense, after a jury rejected his insanity defense. The trial court sentenced the Defendant to life imprisonment. The Defendant appealed, arguing that his insanity defense was established by clear and convincing evidence. In an opinion filed August 9, 2002, a majority of this Court reversed the judgment of conviction, modified the judgment to "Not Guilty by Reason of Insanity," and remanded the case for further proceedings pursuant to Tennessee Code Annotated section 33-7-303. State v. Ramon, No. W2001-00389-CCA-R3-CD, 2002 WL 1841608, at *1 (Tenn. Crim. App. Aug. 9, 2002). The State filed an application for permission to appeal with the Tennessee Supreme Court pursuant to Rule 11(a) of the Tennessee Rules of Appellate Procedure. On December 23, 2002, the Tennessee Supreme Court granted the State's application for the purpose of remanding the case to this Court for reconsideration in light of State v. Flake, 88 S.W.3d 540 (Tenn. 2002). On remand, we find that a rational jury could have found that the Defendant failed to establish by clear and convincing evidence that, as a result of a severe mental illness or defect, the Defendant was unable to appreciate the wrongfulness of his act of stabbing his aunt to death so as to entitle him to the insanity defense. Accordingly, we affirm the Defendant's conviction for first degree murder and his sentence of life imprisonment.

**On Remand from the Tennessee Supreme Court; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOSEPH M. TIPTON, J., joined.

W. Jeffery Fagan, Assistant District Public Defender, Camden, Tennessee, for the Appellant, Luis Anthony Ramon.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; J. Ross Dyer, Assistant Attorney General; G. Robert Radford, District Attorney General; and Steven L. Garrett, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

## I. Facts

On November 2, 1999, the Henry County Grand Jury returned a one count indictment charging the Defendant with first degree murder for the stabbing death of his aunt. The case was tried by jury in the Circuit Court for Henry County on April 19, 2000. We summarized the underlying facts of the Defendant's case on direct appeal as follows:

Richard Allen Levesque testified that on March 11, 1999, he was employed as a 911 dispatcher with the Paris Police Department. Levesque stated that at approximately 2:50 p.m. on that date, he answered a 911 call from 195 Hill Road in Henry County. According to Levesque, a male subject on the line stated that he had just killed his aunt. The subject identified himself as Luis Anthony Ramon. Levesque testified that a tape was made of his initial conversation with the Defendant, as well as his subsequent conversation with the Henry County Sheriff's dispatcher. The tape was entered into evidence as an exhibit and played for the jury. The following content was heard in open court:

Dispatcher: 911, what is your emergency?
Caller: I just stabbed my aunt.
Dispatcher: Pardon me?
Caller: I just stabbed my aunt. She is bleeding.
Dispatcher: You just stabbed her?
Caller: Yes, I did.
Dispatcher: Okay, what is your name?
Caller: Luis Anthony Ramon.
Dispatcher: Luis Anthony Ramon?
Caller: Yes.
Dispatcher: Okay, I'll need to transfer you to the sheriff's office. But first, do you feel any pulse?
Caller: I think she died, because there's blood all over the place.
Dispatcher: Okay, go check and come back to me, okay?
Caller: Yes.
(Another dialing heard and sheriff's office answering.)
Dispatcher: This gentleman is going to be coming back on the line, Luis Ramon, and I'm not sure what his last name is. He said he just stabbed and killed his . . .
(Caller heard coming back on line.)
Dispatcher: Okay, what is your last name again, Luis?
Caller: Ramon.
Dispatcher: Ramon. Okay, I'm going to dispatch an ambulance to the

195 Hill Road.
Caller: Yes.
Dispatcher: Okay, the sheriff's office is on the line now.
Caller: Alright.
Dispatcher: Go ahead and tell them.
Sheriff's office: Yes, sir.
Caller: I just killed my aunt, I think. I stabbed her with a butcher knife.
Sheriff's office: Okay.
Caller: What?
Dispatcher: She's talking to the officers now. We're getting an ambulance underway too.
Caller: Can you tell me how to stop her bleeding?
Dispatcher: Where is she bleeding from?
Caller: (No response.)
Sheriff's office: Sir?
Dispatcher: I was going to tell him how to control the bleeding.
Sheriff's office: Okay, where did he stab her at?
Dispatcher: That's what I'm trying to find out. He stabbed her with a butcher knife. He thinks she's dead.
Sheriff's office: Do what?
Dispatcher: He said he thought she was dead, but she's bleeding all over.
Sheriff's office: Send ambulance to 195 Hill Road.

William Gary Vandiver, an investigator with the Henry County Sheriff's Office, testified that he investigated the stabbing death of the victim. According to Vandiver, he arrived on the scene at approximately 2:50 p.m. on March 11, 1999. Vandiver gave the following testimony regarding his arrival at the crime scene:

I responded to the scene after hearing the radio dispatcher, from my office. I arrived on the scene just seconds behind the patrol officer. The patrol officer was going inside the residence, being a double-wide mobile home. As I entered the front door, only a second or two behind, Sergeant Rod Frey and Deputy Terry Tyler, I heard Deputy Tyler speaking, and the subject identified as Luis Anthony Ramon. Mr. Ramon was dressed in a brown coverall. The coveralls had blood on them. He was wearing boots. As I walked in, I heard Mr. Ramon indicating to Deputy Tyler, "She's over by the washer." And, within a second or so, with Sergeant Frey, he said, "I found her." Sergeant Frey directed me back to a utility room, which is the washer and dryer, utility room of the trailer, which leads right to the rear door. I found, there I found the body of [the victim], lying on the

left side in a fetal position, from the washer and dryer. She appeared to have been stabbed more than once, from what I observed at that time. Large amount of blood on the floor, ah, blood splatters up the three or four feet on the wall, and a large amount of blood up and around her, on her and the washer and dryer. Also, lying on the dryer was a blade, eight-inch blade from a butcher knife, lying inside a handle. The handle had been broken from the knife.

After I made these initial observations, the emergency personnel went in to make sure the victim was deceased. I went out and advised Deputy Tyler to take [the Defendant] from the trailer. I went out and asked [the Defendant], then, who he was. He responded and gave me his name. I asked him how old he was, which he told me he was 15. I asked him who his mother was, and he gave me the name of Donna Ramon. I asked him where his mother was. At this time he told me, "She's at my grandmother's funeral in Smyrna." At this time I took photos of [the Defendant] and collected from him, ah, took coveralls and boots from him at this time as evidence. And [the Defendant] was transported to the Henry County Sheriff's Department.

On further investigation on the scene, I found, in the counter and kitchen area, a white hockey mask; also found a bloody boot print on the living room floor. Ah, correction, on the kitchen floor, leading from the living room.

Vandiver also identified a photograph of the house where the victim was found and testified that the home was the residence of the Defendant and his mother, Donna Ramon. Vandiver stated that a hockey mask was found near the telephone and that there were "blood smudges" on the telephone.

Vandiver testified that through his investigation of this case and after talking to different people, he determined that the Defendant had been acting as if he was Michael Myers[1] for "six months or so." Vandiver stated that "according to the family members, . . . [the Defendant] would be wearing his coveralls or a rain, poncho rain suit. He would stand out in the front yard wearing it, and around the residence, wearing . . . the attire, and at times, the hockey mask." Vandiver further testified that in many of the "Jason movies,"[2] the character, Jason, is standing out in the rain and looking in the residence. Vandiver testified that family members informed him that

[1]Michael Myers is a fictional character first appearing in the horror movie *Halloween*.

[2]Jason is a fictional character in a series of horror movies entitled *Friday the 13th*.

[the Defendant] would "be standing close to the residence, around the window, at night, wearing a hockey mask. Sometimes he'd be holding a flashlight under the hockey mask." Vandiver testified that he spoke to Pat Atchinson from the Henry County School System regarding the Defendant. Vandiver recalled that Atchinson stated that the Defendant had been hearing voices. Vandiver also testified that the victim lived with her father in a place located about one hundred feet behind the Defendant's residence.

Dr. Cynthia Gardner, a forensic pathologist at the University of Tennessee at Memphis, conducted an autopsy on the victim and determined that the cause of death was multiple knife stab wounds. According to Gardner, the victim sustained a 3.2-inch-deep stab wound in the right chest, a 5.4-inch-deep stab wound in the left armpit penetrating two chambers of the heart and the liver, and a 7.1-inch-deep stab wound in the right shoulder penetrating a lung and the liver. Gardner also noted a bruise and a linear abrasion on the victim's forehead, a linear-incised wound below the victim's nose, a linear-incised wound on the right thumb, and a bruise on the right eyebrow. Gardner testified that the linear wounds were defensive wounds. Gardner estimated that the victim would have lived only minutes after receiving the stab wounds.

The trial court ordered the Defendant's admission to Western Mental Health Institution to determine his competency to stand trial, his state of mind at the time of the crime, and his commitability. Dr. Ann Quinn Phyfer, a psychologist at the Western Mental Health Institution, testified for the defense. Dr. Phyfer testified that she met the Defendant when he was admitted to the institution on March 11 or 12, 1999. Phyfer stated that the first time she met with the Defendant, she was a member of a treatment team which included a psychiatrist, a psychologist, a registered nurse, a social worker and an activity therapist. As the result of the evaluation, the Defendant was diagnosed with catatonic schizophrenia, which Phyfer stated refers to "some kind of bizarre movement." She explained that this frequently means that a person will assume a bizarre posture and maintain it or that they will move around in a "senseless way." Phyfer stated, "The essential component of being catatonic is to have purposeless movement," and she reported that in the Defendant's case, he would become immobile.

Phyfer testified that the Defendant was later diagnosed with paranoid schizophrenia. Phyfer explained that schizophrenia is "characterized by a positive and negative symptom. Positive symptoms are hallucinations and/or delusions." According to Phyfer, the Defendant suffered from delusions which Phyfer defined as "beliefs that have no basis in reality, but which are nevertheless held rigidly by the person." Phyfer also stated that persons suffering from delusions "respond to the delusional false belief and don't have any contact, or much contact, with reality." Phyfer specified that the Defendant suffered from paranoid delusions that "there was a group of people who were going to kill him, and he was powerless against this

-5-

group of people." Phyfer further testified that the Defendant "thought that he was going to be killed unless he could somehow protect himself."

Phyfer elaborated on the Defendant's delusions as follows:

> He came to the conclusion, and this is apparently over a long time, because he had delusions about killing other people that date back in the records to 1997. But, and he watched the movie *Halloween* some 30 times. He came to believe that if he could become the character of Jason, or Michael Myers, and wear a mask and carry a knife, that he could himself become a murderer. And if he could become that murderer, he could protect himself against this group. And that was the only way that he could protect himself. And when he wore the mask, and I believe the overalls - that he put on the symbols that represented to him the ability to protect himself and become as bad as his persecutors. That he would become a murderer in order to protect himself, and that was the only way he could see that he could protect himself. He was, back in '97, having the thoughts that he would - this is according to the medical record, he had thoughts of killing two teachers and a principal. And he stated that he'd also kill whoever else came into the bathroom at school. He planned to carry a knife, because he felt he couldn't conceal a gun. But he had that planned. He also planned to kill his mother and her boyfriend. So, this was not just an idea that popped into his head on March the 11th, I think, of 1999. It was something he had had for a long while, earlier than that.

Phyfer also testified that as far back as 1997, it was documented in the Defendant's medical record that he used to set fires without purpose and act excessively cruel to animals, two "hallmarks of childhood that herald the onset of schizophrenia." Phyfer testified that the Defendant said that he would set fires and kill animals "just for the fun of it." Phyfer testified that schizophrenia is a spectrum disorder and that the Defendant's illness was "as severe as [she had] ever seen."

Phyfer was questioned regarding the Defendant's apparent lack of emotion when he made the 911 call, and she responded that schizophrenics often have "deficit symptoms." Phyfer explained that a person with schizophrenia may have a "lack of intensity, a lack of emotional response, that we consider normal." Phyfer testified that where others would "presumably respond by being emotionally happy or sad or fearful, [the Defendant] would not. He would be emotionally flat." Phyfer stated that when the Defendant killed the victim, he was not able to appreciate right from wrong. According to Phyfer, the Defendant "was not in touch with reality and right and wrong." Phyfer testified that there is "no possibility as far as [she] could foresee,

that [the Defendant] would ever be able to function outside of a highly structured, secure, inpatient facility." Phyfer stated that the Defendant had been admitted to the Western Mental Health Institution on five occasions, most recently on February 3, 2000. Phyfer testified that the Defendant was also admitted to Baptist Hospital in Union City in 1998.

Dr. David R. Richie, a psychologist at Western Mental Health Institute, testified that he conducted a forensic examination on the Defendant on March 31, 1999 and submitted a Certificate of Need for Judicial Hospitalization. Richie testified that the Defendant had a severe psychotic disorder, as evidenced by his delusions that he was a movie character who commits serial murders. Richie testified that the Defendant suffered from a flatness of effect or lack of emotion and that he was very reclusive. Richie testified that the Defendant would exhibit and maintain unusual postures such as sitting all day in a "crunched position" staring at the floor. According to Richie, the Defendant complained of hearing voices, such as the voice of the devil, and he stated that on at least one occasion, the Defendant reported he had a visual hallucination. Richie testified that the treatment team determined by a unanimous decision that the Defendant suffered from catatonic and paranoid schizophrenia.

Richie testified that the Defendant had delusions that someone was "out to get him, out to murder him." Richie stated that the Defendant reported having those delusions at age 14. Richie recalled that once, after the Defendant began taking medicine, the Defendant said, "Whatever I'm afraid of, I won't be afraid of anymore if I become what I'm afraid of." Richie believed that in the Defendant's mind, he became the character in the movie *Halloween*. According to Richie, the Defendant did not appreciate the wrongfulness of his acts on March 11, 1999.

Randy Dale Stone, the victim's brother and the Defendant's uncle, testified he lived in the same neighborhood as the Defendant. Stone testified that he saw the victim on a daily basis. Stone believed that the Defendant should be placed in a hospital.

Ramon, 2002 WL 1841608, at **1-5.

After less than an hour of deliberations, the jury returned a verdict finding the Defendant guilty of first degree murder, and by this verdict, implicitly rejected the insanity defense. The trial court subsequently sentenced the Defendant to life imprisonment. On direct appeal, the Defendant raised two issues for review: (1) whether the evidence was sufficient as a matter of law to sustain the conviction; and (2) whether the triers of fact erred in failing to find the Defendant not guilty by reason of insanity.

In an opinion filed August 9, 2002, a majority of this Court reversed the judgment of

conviction, modified the judgment to "Not Guilty by Reason of Insanity," and remanded for further proceedings pursuant to Tennessee Code Annotated Section 33-7-303. Ramon, 2002 WL 1841608, at *1. Specifically, we concluded that:

> [T]he Defendant proved by clear and convincing evidence that he was insane at the time of the offense. The record is virtually void of any evidence that the Defendant was sane at the time of the stabbing. It is undisputed that the Defendant was hospitalized for mental illness on several occasions before his arrest in this case. Furthermore, two qualified mental health professionals gave uncontroverted and unimpeached testimony indicating that the Defendant was unable to appreciate the wrongfulness of his acts at the time of the crime as a result of a severe mental disease or defect. Our review reveals neither sufficient lay testimony nor sufficient expert testimony concerning the Defendant's mental state at or near that time of the stabbing that would justify rejection of the insanity defense. Because we conclude that a rational trier of fact could only find that the Defendant, at the time of the stabbing, was unable to appreciate the wrongfulness of his act as a result of a severe mental disease, we find that the defense of insanity was established by clear and convincing evidence. See State v. Flake, No. W2000-01131-CCA-MR3-CD, 2001 Tenn. Crim. App. LEXIS 517, at *16 (Tenn. Crim. App., Jackson, July 13, 2001). In reaching our conclusion, we are mindful that all factual issues and the weight to be given evidence are within the purview of the trier of fact. See Buggs, 995 S.W.2d at 105; Matthews, 805 S.W.2d at 779; Liakas, 256 S.W.2d at 859. However, because we conclude, after viewing the evidence in a light most favorable to the State, that a rational trier of fact could only find that insanity has been established by clear and convincing evidence, we may not sustain a guilty verdict. See generally Tenn. R. App. P. 13(e); Jackson, 443 U.S. at 319.

Ramon, 2002 WL 1841608, at *6.

In a dissenting opinion, Judge Joseph M. Tipton disagreed with the majority because "it was the jury's prerogative to discredit some or all of the defendant's experts' testimony and to conclude that their testimony did not prove by clear and convincing evidence that the defendant could not appreciate the wrongfulness of his conduct." Ramon, 2002 WL 1841608, at *7 (Tipton, J., dissenting). Judge Tipton explained that:

> Although both experts testified that the defendant was unable to appreciate the wrongfulness of his acts at the time of the killing, I do not believe the jury was required to accept their testimony as fact. The very fact that the defendant called 9-1-1 and explained what he had done, and to whom, reflects an awareness of what had occurred. Moreover, his history of plans to kill others, including the use of a knife because he could not conceal a gun, does not reflect an incapacity to know right from wrong.

Ramon, 2002 WL 1841608, at *7 (Tipton, J., dissenting).

Thereafter, the State filed an application for permission to appeal to the Tennessee Supreme Court pursuant to Rule 11(a) of the Tennessee Rules of Appellate Procedure, arguing that this Court erred in overturning the jury's determination that the Defendant failed to prove his insanity defense by clear and convincing evidence. Specifically, the State argued that in light of State v. Flake, 88 S.W.3d 540 (Tenn. 2002) ("Flake I"), "[t]he Court of Criminal Appeals erred in reversing [the Defendant's] conviction based upon its finding that the jury did not have the option of discrediting the conclusions of [the Defendant's] expert witnesses." On December 23, 2002, the Tennessee Supreme Court granted the State's application for the purpose of remanding the case to our Court for reconsideration in light of Flake I.

## II. Analysis

The Tennessee Supreme Court has remanded this case to our Court for reconsideration in light of Flake I, 88 S.W.3d 540, which was issued twenty days after we issued our original opinion. Approximately one year after Flake I, the Tennessee Supreme Court issued State v. Flake, __ S.W.3d __, 2003 WL 21788920 (Tenn. 2003) ("Flake II"), which involved the same defendant and the same insanity defense issue. Because both Flake I and Flake II are dispositive to this case, we will consider both cases on remand.

On direct appeal, the Defendant raised two issues for review: (1) whether the evidence was sufficient as a matter of law to sustain the conviction; and (2) whether the triers of fact erred in failing to find the Defendant not guilty by reason of insanity. Accordingly, we will reconsider both issues on remand in light of Flake I and Flake II.

### A. Sufficiency of the Evidence

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all

factual issues raised by the evidence are resolved by the trier of fact. <u>Liakas</u>, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. <u>State v. Evans</u>, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. <u>Id.</u>

The Defendant argued on direct appeal that "a rational trier of fact would not have returned a verdict of guilty to First Degree Murder in this case" because "the proof offered by the defense and lack of proof presented by the State overwhelmingly shows that a rational trier of fact would have found the defendant not guilty by reason of insanity." Therefore, the Defendant's argument that there was insufficient evidence to convict him of first degree murder hinges upon whether the jury erred when it rejected the Defendant's insanity defense. If the jury erred in rejecting the insanity defense, then the evidence is insufficient to convict the Defendant of first degree murder and we must find that he was not guilty by reason of insanity. However, if the jury did not err in rejecting the insanity defense, then we must affirm the conviction because sufficient evidence exists to support the conviction.

**B. Insanity Defense**

The insanity statute, Tennessee Code Annotated section 39-11-501 (1997), provides as follows:

> Insanity. (a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.
>
> (b) As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.
>
> (c) No expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a). Such ultimate issue is a matter for the trier of fact alone.

Tenn. Code Ann. § 39-11-501. Under this statute, the insanity defense applies only when the defendant has a severe mental disease or defect that results in the defendant's being "unable to appreciate the nature or wrongfulness of such defendant's acts." Tenn. Code. Ann. § 39-11-501(a). Furthermore, insanity is an affirmative defense under the statute, and, as such, the defendant has the burden of proving the defense by clear and convincing evidence. Tenn. Code Ann. § 39-11-501(a); <u>Flake I</u>, 88 S.W.3d at 551. "Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence."

Hodges v. S. C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992). Moreover, the insanity statute prohibits expert witnesses from offering opinion testimony on whether the defendant was sane at the time the offense was committed. Tenn. Code Ann. § 39-11-501(c); Flake I, 88 S.W.3d at 551. The ultimate issue of the defendant's sanity is "a matter for the trier of fact alone." Tenn. Code Ann. § 39-11-501(c); Flake I, 88 S.W.3d at 551.

In this case, the jury rejected the Defendant's insanity defense and convicted him of first degree murder. Accordingly, on remand, we must review whether the jury erred in rejecting the Defendant's insanity defense. Tennessee Code Annotated section 39-11-501 "does not by its terms alter the standard of appellate review of a jury's finding on the insanity defense." Flake I, 88 S.W.3d at 551. In Flake I, the Tennessee Supreme Court held that:

> The sufficiency of the evidence standard previously applied by appellate courts reviewing a jury finding on sanity–whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt–is no longer appropriate.

Id. at 551. In the place of the sufficiency of the evidence standard, the Tennessee Supreme Court unanimously concluded that:

> [A]ppellate courts in Tennessee should apply the reasonableness standard[3] when

---

[3]The reasonableness standard of appellate review is used by the Fifth Circuit to review a jury's rejection of the insanity defense under the federal insanity statute. See United States v. Barton, 992 F.2d 66, 68-69 (5th Cir. 1993). In Barton, the Fifth Circuit Court of Appeals held that:

> Normally, "[i]n reviewing a motion for judgment of acquittal, we 'consider the evidence as a whole taken in the light most favorable to the government, together with all legitimate inferences to be drawn therefrom to determine whether a rational trier of fact could have found guilt beyond a reasonable doubt.'" United States v. Turner, 960 F.2d 461, 465 (5th Cir. 1992) (citations and footnote omitted); see United States v. Sanchez, 961 F.2d 1169, 1173 (5th Cir.), cert. denied, 506 U.S. 918, 113 S. Ct. 330, 121 L. Ed. 2d 248 (1992); United States v. Newman, 889 F.2d 88, 92 (6th Cir.1989), cert. denied, 495 U.S. 959, 110 S. Ct. 2566, 109 L. Ed. 2d 748 (1990). Here, our review is different because insanity is an affirmative defense for which the defendant, not the government, bears the burden of proof at trial by clear and convincing evidence. 18 U.S.C. § 17 (1988). Accordingly, we should reject the jury verdict in this respect only if no reasonable trier of fact could have failed to find that the defendant's criminal insanity at the time of the offense was established by clear and convincing evidence.

Barton, 992 F.2d at 68-69. As explained in Flake I, 88 S.W.3d at 552-53, the reasonableness standard has been adopted by some state courts, including Georgia and Louisiana. See, eg., Fuss v. State, 519 S.E.2d 446, 448 (Ga. 1999); State v. Silman, 663 So.2d 27, 32 (La. 1995); State v. Prince, 688 So.2d 643, 649 (La. Ct. App. 1997). In addition to the Fifth Circuit, the United States Court of Appeals for the Armed Forces has also adopted the reasonableness standard when evaluating a jury's rejection of the insanity defense. United States v. Martin, 56 M.J. 97, 106 (C.A.A.F. 2001).

reviewing a jury's rejection of the insanity defense. . . . Accordingly, appellate courts in Tennessee should reverse a jury verdict rejecting the insanity defense only if, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence. . . . A reviewing court applying the reasonableness standard should consider all the evidence in the record in the light most favorable to the state in determining whether the jury appropriately rejected the insanity defense.

Id. at 554. While the reasonableness standard "is properly deferential to the finding of the trier of fact," the standard "does not totally insulate the jury's finding from appellate review." Id. If the appellate court, considering the evidence in the light most favorable to the State, finds that no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence, then it should reverse the jury's rejection of the insanity defense. Id.

In Flake I, the Tennessee Supreme Court explicitly rejected "the notion that the State must rebut defense proof of insanity with substantial evidence," because "[t]he current statute clearly does not impose such a burden of proof on the prosecution." Id. Rather, Tennessee Code Annotated section 39-11-501(a) places the burden of establishing the insanity defense "squarely on the defendant." Flake I, 88 S.W.3d at 554. The Tennessee Supreme Court explained that once the insanity defense has been interposed, the State will in most cases attempt to counter the defense proof in some manner, either by "contrary expert testimony, lay witnesses, or vigorous cross-examination designed to undermine the credibility of the defense experts." Id. In determining whether the jury properly rejected the insanity defense, the appellate court must consider all the evidence in the record, including evidence of the defendant's actions and words at or near the time of the offense and the lay and expert testimony. Id. (citing State v. Sparks, 891 S.W.2d 607, 616 (Tenn. 1995); State v. Jackson, 890 S.W.2d 436, 440 (Tenn. 1994); Edwards v. State, 540 S.W.2d 641, 647 (Tenn. 1976)). The Tennessee Supreme Court further explained that:

> The weight and value to be given expert testimony is a question for the jury. [Sparks, 891 S.W.2d at 616]. Where there is a conflict in the evidence, the trier of fact is not required to accept expert testimony over other evidence and must determine the weight and credibility of each in light of all the facts and circumstances of the case. Id. Questions concerning the credibility of witnesses, the weight and value of the evidence, as well as all factual disputes raised by the evidence, are for the trier of fact; appellate courts do not reweigh the evidence or reevaluate credibility determinations. [State v. Holder, 15 S.W.3d 905, 912 (Tenn. Crim. App. 1999)].

Flake I, 88 S.W.3d at 554.

In Flake I, the defendant was charged with attempted first degree murder for shooting his pastoral counselor at a church in Memphis, Tennessee. Id. at 542. At trial, the facts surrounding the

shooting were not contested, and the defendant sought to establish the affirmative defense of insanity. Id. The jury found the defendant guilty of attempted voluntary manslaughter, implicitly rejecting the insanity defense. Id. On direct appeal, the defendant asserted, among other things, that the insanity defense was established by clear and convincing evidence and that the jury had erred in rejecting it. Id. This Court agreed, modified the verdict to not guilty by reason of insanity, and remanded the case to the trial court. Id. The Tennessee Supreme Court granted the State's application for permission to appeal and reversed our holding. The Supreme Court applied the reasonableness standard of review, and a majority of the court concluded that a reasonable trier of fact could have found that the defendant failed to show by clear and convincing evidence that, as a result of a severe mental illness or defect, he was unable to appreciate the wrongfulness of his acts.[4] Id. at 555.

In reaching its decision, the majority of the Tennessee Supreme Court found evidence in the record that supported the jury's rejection of the defendant's insanity defense:

> First, the record contains evidence suggesting the defendant was not suffering from a severe mental illness at the time of the offense. As much as two weeks and as little as two days prior to this shooting, the defendant had the presence of mind to falsely answer questions regarding prior mental health treatment and drug abuse which, had he answered truthfully, probably would have prevented him from obtaining the weapon used to commit this crime. In addition, the proof showed that, while the defendant behaved strangely during the week preceding the shooting, his behavior on the day of the shooting had been perfectly normal. As stated by Dr. Hutson, the defendant awoke about 9:00 a.m., was in a good mood, helped his father cook breakfast, worked on his car with his father, rode his trail bike, walked his dog in the park, watched a movie about a criminal trial, chose a television movie to watch that evening with his parents, helped cook dinner on an outdoor grill, ate dinner, and then left for a meeting at Central Church about 5:40 p.m., assuring his parents he would return immediately after the meeting to watch the movie together as planned. While the shooting itself was certainly unexpected, there is proof in the record to suggest an explanation, albeit far-fetched, for the shooting. The testimony indicated that the defendant was preoccupied with homosexuality, that he believed the victim was very effeminate, that he suspected the victim was homosexual, and that he hated the

---

[4]Justice E. Riley Anderson and Justice Adolpho A. Birch, Jr., concurred in the majority's holding that a jury verdict rejecting the insanity defense should be reversed only if the appellate court, viewing the evidence in a light most favorable to the prosecution, concludes that no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence. Flake I, 88 S.W.3d at 557 (Anderson, J., concurring and dissenting, in which Birch, J., joined). However, both justices disagreed with the majority's application of the standard to the facts and circumstances of the case "in which virtually all of the lay and expert testimony established the defendant's insanity *at the time of the offense*." Id. (emphasis in original). "In my view, the Court of Criminal Appeals correctly determined that no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence. I therefore dissent." Id. at 560 (Anderson, J., concurring and dissenting, in which Birch, J., joined).

victim for the way he touched him. Dr. Hutson testified that, given his preoccupation with homosexuality, physically touching the defendant could have fatal consequences. This proof suggests a motive for the shooting, and the jury's verdict of attempted voluntary manslaughter indicates that perhaps this motive was credited.

Second, defense proof that the defendant suffered from a severe mental illness was countered by testimony elicited on cross-examination of the defense experts suggesting the defendant was malingering. Although all the mental health experts opined that the defendant suffers from schizophrenia, the proof is clear that, throughout ten years of prior mental health treatment, the defendant had not been diagnosed as schizophrenic and had never complained of auditory hallucinations. In fact, the defendant's report of auditory hallucinations following his arrest was not spontaneous but was in response to a question from his mother. The experts admitted that the defendant's report of auditory hallucinations was a critical factor in the diagnosis of schizophrenia, and they conceded that there are no existing objective tests to verify that the defendant actually suffers from auditory hallucinations. Results of two psychological tests indicated that the defendant was malingering mental illness, but the expert witnesses discounted these results. Two of the experts testified that had the defendant not reported auditory hallucinations, he likely would have been diagnosed as suffering from various personality disorders, which generally are not considered to be severe mental conditions capable of supporting an insanity defense. The proof also showed that, before his arrest, the defendant had attended the University of Memphis for three years studying criminal justice and that on the day of his admission to Western, he had advised Dr. Linder that he intended to plead not guilty by reason of insanity and believed he would be released within sixty to ninety days if he received a verdict on that plea. According to psychological records of the defendant's mental health treatment prior to his arrest, he had a history of polysubstance abuse and had often lied to his parents about the extent to which he abused drugs and alcohol. Although the experts testified that the defendant's history of substance abuse had no impact on their evaluations since he had been incarcerated and had no access to drugs, Dr. Linder admitted that the defendant tested positive for amphetamines when he arrived at Western, even though he had no prescription for amphetamines. Dr. Linder assumed the result was a false positive but admitted that he did not re-test to confirm this assumption.

Finally, notwithstanding expert proof to the contrary, the facts surrounding the offense suggest the defendant realized his conduct was wrongful. With the exception of Dr. Craddock, the mental health professionals testified that the defendant was unable to appreciate the wrongfulness of his conduct in shooting the victim. Dr. Craddock opined that the defendant was aware that shooting someone was wrongful, but he felt morally justified in shooting the victim whom he believed to be a terrorist. The facts show, however, that the defendant did not shoot the parishioner with whom the victim was meeting, and he fled the scene, rather than

waiting for the arrival of the FBI. At the time of his arrest, the defendant appeared to realize he had committed a crime. When asked if he knew why the officers were at his house he responded "yes" and told the officers that the weapon was in the glove compartment. Although the officers said the defendant showed little emotion and appeared "distraught" or "tired," they observed no bizarre behavior. After his arrest, the defendant complied with his attorney's instruction not to speak with anyone alone, as is evidenced by Dr. Hutson's testimony that the defendant was reluctant to speak with him until receiving permission from his attorney. Dr. McIntosh, Dr. Luttrell and John Perry said the defendant behaved normally while incarcerated although he did appear depressed.

Flake I, 88 S.W.3d at 555-56.

In conclusion of Flake I, the Tennessee Supreme Court explained that:

Where the proof is contested, appellate courts should rarely reverse a jury's rejection of the insanity defense under this deferential standard of review. . . . [A]ppellate courts are not fact finders, and reversal is not appropriate where the evidence might appear to us clear and convincing were we fact finders. Appellate courts do not reweigh the evidence or reassess credibility determinations. These tasks are within the province of the jury. While the proof in this record indicates that the defendant suffers from a mental disorder, such proof does not mandate a jury finding that a defendant is legally insane. Cf. Coe v. State, 17 S.W.3d 193, 221 (Tenn. 2000) ("[T]he existence of a mental disorder does not automatically translate into a finding of incompetency to be executed."); Reed, 997 F.2d at 334 ("Insanity, for our purposes, is a legal term. We do not ask whether Reed is insane by psychiatric or psychological standards."). In determining whether a defendant is insane, a jury is entitled to consider all the evidence offered, including the facts surrounding the crime, the testimony of lay witnesses, and expert testimony. While a jury may not arbitrarily ignore evidence, a jury is not bound to accept the testimony of experts where the evidence is contested. Indeed, this principle is explicitly reflected in the current statute which prohibits experts from testifying on the ultimate issue of the defendant's sanity and reserves this issue for the trier of fact alone.

Id. at 556-57.

In Flake II, the Tennessee Supreme Court applied the Flake I reasonableness standard of review to the facts of Flake II, which involved the same defendant but separate offenses. Flake II, __ S.W.3d at __, 2003 WL 21788920, at *14-15. As in Flake I, the facts surrounding the shootings in Flake II were uncontested at trial. In Flake II, the defendant fatally shot two men and was indicted on two counts of premeditated first degree murder. Id. at *1. Again, as in Flake I, the defendant focused upon establishing the affirmative defense of insanity. Id. at *1. The jury rejected the insanity defense and found the defendant guilty on both counts of premeditated first degree murder.

Id. at *1. On direct appeal, the defendant argued, among other things, that the insanity defense had been established by clear and convincing evidence and that the jury had erred in rejecting it. Id. This Court agreed, modified the verdict to not guilty by reason of insanity, and remanded the case to the trial court. Id. Therefore, in Flake II, the Tennessee Supreme Court was faced with resolving the exact same issue which came before it in Flake I: whether the jury erroneously rejected the insanity defense. Id.

A majority of the Flake II court analyzed whether the jury erroneously rejected the insanity defense by using the reasonableness standard of review set forth in Flake I and ultimately reached the same result as the majority in Flake I.[5] The majority found that: (1) the record contained evidence suggesting the defendant was not suffering from a severe mental illness at the time of the shootings; (2) the defendant's proof that he suffered from a severe mental illness was countered by testimony elicited by vigorous cross-examination that it was also plausible that the defendant was malingering; and (3) the record contained proof suggesting that the defendant realized his conduct was wrong. Flake II, __ S.W.3d at __, 2003 WL 21788920, at *15-17. Accordingly, the majority in Flake II was "unable to conclude that no reasonable trier of fact could have failed to find that the defendant's criminal insanity at the time of the offense was established by clear and convincing evidence." Id. at *18.

Having reviewed the reasonableness standard of review set forth and applied in Flake I and Flake II, we now apply this standard of review to the facts of this case. Considering the evidence in this record in accordance with the principles set forth in Flake I and Flake II, we conclude that a reasonable trier of fact could have found that the Defendant failed to show by clear and convincing evidence that, as a result of a severe mental illness or defect, he was unable to appreciate the nature or wrongfulness of his actions.

First, notwithstanding the expert testimony of Drs. Phyfer and Richie to the contrary, the record contains proof suggesting that the Defendant realized his conduct of stabbing his aunt to death was wrongful. Both Drs. Phyfer and Richie testified that the Defendant "didn't know right from wrong" when he stabbed his aunt with a butcher knife. However, after stabbing his aunt, the Defendant had the presence of mind to call 9-1-1 in order to summon help for his aunt, who lay bleeding on the utility room floor. The following excerpts from the 9-1-1 call tend to show that the Defendant knew that his act of stabbing his aunt was wrongful:

Dispatcher: 911, what is your emergency?
Caller: I just stabbed my aunt.
Dispatcher: Pardon me?
Caller: I just stabbed my aunt. She is bleeding.

---

[5]Again, as in Flake I, Justice Anderson and Justice Birch dissented from the majority opinion and filed separate dissenting opinions because "no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence." Flake II, __ S.W.3d at __, 2003 WL 21788920, at *29 (Anderson, J., dissenting, in which Birch, J., joined).

-16-

Dispatcher: You just stabbed her?
Caller: Yes, I did.
Dispatcher: Okay, what is your name?
Caller: Luis Anthony Ramon.

\* \* \*

Dispatcher: Okay, I'll need to transfer you to the sheriff's office. But first, do you feel any pulse?
Caller: I think she died, because there's blood all over the place.
Dispatcher: Okay, go check and come back to me, okay?
Caller: Yes.

\* \* \*

Dispatcher: Go ahead and tell them.
Sheriff's office: Yes, sir.
Caller: I just killed my aunt, I think. I stabbed her with a butcher knife.
Sheriff's office: Okay.

\* \* \*

Caller: Can you tell me how to stop her bleeding?
Dispatcher: Where is she bleeding from?
Caller: (No response.)

\* \* \*

Because the Defendant made this 9-1-1 call moments after he stabbed his aunt multiple times, these excerpts reliably indicate the Defendant's state of mind at the time of his criminal act. The Defendant clearly knew that he stabbed his aunt with a butcher knife and that "[s]he [was] bleeding." Indeed, the Defendant admitted four times to stabbing his aunt during this 9-1-1 call. Furthermore, in response to the dispatcher's question as to whether his aunt had a pulse, the Defendant responded, "I think she died, because there's blood all over the place." This response indicates that the Defendant realized that, as a result of his attack with the butcher knife, his aunt had probably died. Moreover, the Defendant asked the dispatcher, "[c]an you tell me how to stop her bleeding?" This question tends to show that the Defendant realized that his aunt's bleeding was a negative consequence of the stabbing and that the bleeding must stop or his aunt would die. A reasonable trier of fact could have inferred from this evidence that the Defendant knew what he had done to his aunt was wrong and that he wanted to correct it. If the Defendant did not believe that his act of stabbing his aunt was wrongful, then he would not have called 9-1-1 in an attempt to save her from bleeding to death. The Defendant's 9-1-1 call evinces the Defendant's appreciation of the wrongfulness of his act.

Second, Detective Vandiver's testimony, which described the Defendant's mannerisms and responses to questions after the sheriff's deputies arrived, tends to show that the Defendant knew he had committed a crime. Detective Vandiver testified that:

> As I walked in, I heard [the Defendant] indicating to Deputy Tyler, "She's over by the washer." . . . I went out and advised Deputy Tyler to take [the Defendant] from the trailer. I went out and asked [the Defendant], then, who he was. He responded and gave me his name. I asked him how old he was, which he told me he was 15. I asked him who his mother was, and he gave me the name of Donna Ramon. I asked him where his mother was. At this time he told me, "She's at my grandmother's funeral in Smyrna."

This testimony indicates that when the sheriff's deputies arrived at the crime scene, the Defendant had the presence of mind to tell the deputies the location of his victim. The Defendant knew that the law enforcement officials were at his home because he had stabbed his aunt, and he pointed them in the right direction. Furthermore, Detective Vandiver's testimony tends to show that the Defendant was coherent and responsive to questions about who he was and where his mother was that afternoon. The detective did not testify that the Defendant was acting delusional when the detective questioned him, rather the testimony reflects that the Defendant had no trouble answering the questions. Finally, this testimony reveals that the Defendant committed the murder while his mother was away at his grandmother's funeral in Smyrna. While certainly not conclusive, a reasonable trier of fact could conclude from this testimony that the Defendant waited to commit the murder until his mother was gone because he knew murdering his aunt was wrong and did not want his mother to interfere with his plans.

Next, Dr. Phyfer testified about the Defendant's thoughts and plans about murdering people in 1997. Dr. Phyfer testified that:

> [The Defendant] had thoughts of killing two teachers and a principal. And he stated that he'd also kill whoever else came into . . . the bathroom at school. He planned to carry a knife, because he felt he couldn't conceal a gun. But he had that planned. He also planned to kill his mother and her boyfriend.

This testimony shows that the Defendant had a history of planning to kill other people, including his teachers, his principal, his mother, and his mother's boyfriend. In addition, the testimony that he planned to carry a knife instead of a gun "because he felt he couldn't conceal a gun" tends to show that the Defendant, at least in 1997, had the capacity to know right from wrong. A reasonable trier of fact could have inferred from this testimony that the Defendant, in 1997, realized that he would have to conceal the knife in order to carry out his planned murders because the Defendant knew that murder was wrong. This testimony, while not as strong as the 9-1-1 call, could be considered by a reasonable trier of fact in concluding that the Defendant had the capacity to know right from wrong when he stabbed his aunt to death.

Also, we note that the evidence in the record clearly shows that the Defendant suffers from catatonic and paranoid schizophrenia. However, such proof does not mandate a jury finding that a defendant is legally insane. Coe, 17 S.W.3d at 221. Under Tennessee Code Annotated section 39-11-501, in order to be found not guilty by reason of insanity, the defendant must prove by clear and convincing evidence that "at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts. Mental disease or defect does not otherwise constitute a defense." Tenn. Code Ann. § 39-11-501(a). Although both defense doctors testified that the Defendant did not appreciate the wrongfulness of his acts and the State did not cross-examine the doctors on that issue, "[t]he weight and value to be given expert testimony is a question for the jury." Flake I, 88 S.W.3d at 554. The insanity statute does not require the State to offer rebuttal proof because the Defendant has the burden of proving this affirmative defense by clear and convincing evidence. As we explained above, other evidence, most notably the 9-1-1 call, tended to show that the Defendant knew that he had stabbed his aunt with a butcher knife and that he appreciated the wrongfulness of stabbing his aunt to death. While the Defendant in this case has proven by clear and convincing evidence that he suffered from a severe mental disease at the time he committed the murder, a reasonable trier of fact could have found that he failed to prove by clear and convincing evidence that he was unable to appreciate the nature or wrongfulness of his acts.

Finally, the Defendant argues that the jury rejected the insanity defense and convicted the Defendant of first degree murder based upon its fear that he would be released back into their community. The Defendant argues that "the jury in question wanted to find the defendant not guilty by reason of insanity as evidenced by the question posed to the trial court judge concerning placement of the defendant if a verdict of not guilty by reason of insanity was reached." The trial court gave the jury detailed instructions regarding both the elements of first degree murder and the insanity defense.[6] The Defendant did not object to the instructions at trial and does not contest them

---

[6]The trial judge recited to the jury the following instructions:

The law which applies to this case is stated in this charge and it is your duty to carefully consider all of the instructions in arriving at your decision. . . . The defendant cannot be convicted of any criminal offense unless the State has proven beyond a reasonable doubt all of the elements of the crime charged and that it was committed before the finding and returning of the indictment in this case. . . . For you to find the defendant guilty of [first degree murder], the State must have proven beyond a reasonable doubt the existence of the following essential elements: (1) that the defendant unlawfully killed [the victim]; (2) that the defendant acted intentionally; and (3) that the killing was premeditated. . . . [S]hould you return a verdict of guilty [of first degree murder], the court will impose a life sentence. . . .

The defendant has the burden of proving the defense of insanity by clear and convincing evidence. For you to return a verdict of not guilty by reason of insanity, the defendant must prove both of the following: (1) that he had a severe mental disease or defect at the time that the acts constituting the crime were committed; and (2) that as a result of this severe mental disease or defect, he was not able to understand what he was doing, or to understand that what he was doing was wrong. . . . A verdict of not guilty by reason of insanity shall result in the automatic detention of the defendant in a mental hospital or treatment center, pending further medical and legal findings. . . .

-19-

on appeal. We must presume that the jury properly followed the trial court's instructions absent clear and convincing proof to the contrary. See State v. Smith, 893 S.W.2d 908, 923 (Tenn. 1994); State v. Woods, 806 S.W.2d 205, 211 (Tenn. Crim. App. 1990); State v. Vanzant, 659 S.W.2d 816, 819 (Tenn. Crim. App. 1983). Here, the Defendant has not shown that the jury did not follow the trial court's instructions. Accordingly, we find this argument to be without merit.

As an appellate court, we may not "reweigh the evidence or reevaluate credibility determinations." Flake I, 88 S.W.3d at 554. When determining whether the jury properly rejected the insanity defense, we must consider all the evidence in the record, including evidence of the Defendant's actions and words at or near the time of the offense and the lay and expert testimony. Id. After thoroughly reviewing the record in the light most favorable to the State, we conclude that a reasonable trier of fact could have found that the Defendant failed to show by clear and convincing evidence that, as a result of a severe mental illness or defect, he was unable to appreciate the nature or wrongfulness of his acts. Because we find that the jury did not err in rejecting the insanity defense, we conclude that sufficient evidence exists to support the Defendant's conviction of first degree murder.[7]

Accordingly, we AFFIRM the judgment of the trial court finding the Defendant guilty of first degree murder and sentencing him to life imprisonment.

_____
ROBERT W. WEDEMEYER, JUDGE

---

We must presume that the jury in this case followed the instructions given to it by the trial judge. Accordingly, we presume that the jury found that the State proved beyond a reasonable doubt that the Defendant unlawfully killed his aunt and that he acted intentionally and with premeditation. We also presume that the jury found that the Defendant did not prove the affirmative defense of insanity by clear and convincing evidence.

[7] The following evidence in the record supports the conviction of first degree murder: (1) the Defendant admitted four times in the 9-1-1 call that he killed his aunt by stabbing her; (2) the Defendant stabbed his aunt multiple times, causing her to bleed to death; (3) sheriff's deputies found the Defendant at the crime scene wearing bloody coveralls and bloody boots; (4) deputies found a bloody boot print on the kitchen floor and "blood smudges" on the telephone; (5) the Defendant dressed up as fictional serial killers several times prior to the murder; (6) the Defendant was infatuated with the horror movie, *Halloween*, and emulated the character Michael Myers when he killed his aunt by stabbing her with a butcher knife and wearing a mask as he stabbed her; and (7) the Defendant expressed an interest in killing people with a knife in the past.